188 Cal.App.4th 1224 (2010)
In re THE CLERGY CASES I.
JOHN DOE 1 et al., Plaintiffs and Respondents,
v.
FRANCISCAN FRIARS OF CALIFORNIA, INC., et al., Defendants and Appellants.
No. B215775.
Court of Appeals of California, Second District, Division Eight.
September 30, 2010.
*1228 Howie & Smith, Robert G. Howie and Audrey Smith for Defendants and Appellants Samuel Charles Cabot, Mario Cimmarusti, David Johnson, Gus Krumm, Gary Pacheco and Robert Van Handel.
Kasowitz, Benson, Torres & Friedman, Brian P. Brosnahan and David A. Thomas for Defendant and Appellant Franciscan Friars of California, Inc.
Nye, Peabody, Stirling & Hale, Timothy C. Hale; Kiesel, Boucher & Larson and Anthony M. Demarco for Plaintiffs and Respondents.

OPINION
GRIMES, J.

INTRODUCTION
This consolidated appeal arises from lawsuits in which 25 plaintiffs sued defendant Franciscan Friars of California, Inc. (the Franciscans), alleging they had been sexually abused by Franciscan brothers. In a settlement of the lawsuits, plaintiffs and the Franciscans asked the court to retain jurisdiction to determine if it was appropriate to publicly release confidential files of the *1229 alleged perpetrators, appellants Samuel Charles Cabot, Mario Cimmarusti, David Johnson, Gus Krumm, Gary Pacheco, and Robert Van Handel (the Individual Friars). We hold that compelling social interests in protecting children from molestation outweigh the Individual Friars' privacy rights, and the trial court correctly ordered the public release of psychiatric and other confidential records in the possession of the Franciscans.

FACTUAL AND PROCEDURAL BACKGROUND

1. The settlement agreement

In 25 separate lawsuits, plaintiffs alleged they had been sexually abused by members of the clergy, including the Individual Friars.[1] During the pendency of the proceedings, the Franciscans produced some personnel files and other confidential files of the Individual Friars to the trial court and plaintiffs, along with various privilege logs. The Franciscans also submitted deposition transcripts with redactions. On May 25, 2006, the Franciscans and plaintiffs entered into a written settlement agreement. The agreement required the Franciscans and another named defendant, the Roman Catholic Archbishop of Los Angeles, to pay the total sum of $28.45 million to plaintiffs. The Individual Friars were not named defendants in all 25 lawsuits, and most of them did not sign the settlement agreement.
Paragraph 15 of the settlement agreement (Paragraph 15) established a procedure for a hearing officer to decide whether the Franciscans' confidential files concerning the Individual Friars could be released to the public. The Franciscans agreed to produce to plaintiffs and lodge with the court the files of any alleged perpetrator, all documents previously withheld from plaintiffs as identified in privilege logs relating to childhood sexual abuse, deposition testimony, and any new privilege logs reflecting withheld documents. After the Franciscans submitted the documents to the hearing officer, the Franciscans had 15 days to "provide appropriate notice of the potential *1230 release of such documents to any [alleged perpetrator], and/or any affected third parties [who had the right to] submit his or her objection(s) . . . ." The hearing officer would then hold a hearing and determine which redactions, withholdings, or objections would be disallowed and which, if any, documents could be released to the public. The parties agreed that no redacted or withheld document would be released unless authorized by the hearing officer.
Additionally, pursuant to Paragraph 15, no third party privacy rights could be claimed by the Franciscans as to documents deemed to affect "public safety issues relating to childhood sexual abuse" or that reflect "the knowledge of the defendants as to the suspected sexual abuse of a child" or the "cover up" thereof. However, this provision did not limit the rights of third party objectors, including alleged perpetrators such as the Individual Friars, to assert any objections supported by law. The settlement agreement stated the documents "to be produced have been or would have been subject to discovery obligations in the litigation . . . ."
The settlement agreement further provided that it was "a binding agreement, enforceable under California Code of Civil Procedure Section 664.6. The Parties hereto consent and agree that the Superior Court . . . shall retain jurisdiction to enforce the terms and conditions of this Settlement Agreement, including . . . Orders of the Superior Court . . . made under paragraph 15 . . . subject to normal appellate rights and procedures . . . ." After the settlement agreement was executed, the underlying lawsuits were dismissed. The trial coordinating judge designated the Honorable Peter Lichtman as the hearing officer to preside over the enforcement of Paragraph 15.

2. The proceedings addressing the release of documents

In September 2006, the Franciscans and plaintiffs began the process of determining which, if any, documents could be released to the public. In addition to those documents previously produced, the Franciscans submitted to the trial court other files and depositions relating to the Individual Friars, along with proposed redactions and objections. The documents included psychiatric reports.
The Franciscans notified the Individual Friars of their rights to object to the publication of the documents. In response, and as permitted by Paragraph 15 of the settlement agreement, most of the Individual Friars served objections to the release of some documents, or parts of documents. Among other objections, the Individual Friars argued the documents were protected from disclosure by their constitutional rights to privacy, the psychotherapist-patient privilege, and the physician-patient privilege. The Individual Friars also *1231 submitted privilege logs. In a stipulated order, plaintiffs, the Franciscans and the Individual Friars agreed that the privacy issue would be decided first, as it might be dispositive.
In two hearings, the Franciscans, the Individual Friars, and plaintiffs addressed the threshold issue of whether the Individual Friars had privacy rights to prevent disclosure of their confidential files. In its June 18, 2007 order, the court found it had jurisdiction to "make findings of facts under a Section 664.6 reservation." The court found the Individual Friars' privacy rights "must give way to the State's interest in protecting its children from sexual abuse."
In March 2008, the Individual Friars served additional privilege logs. In September 2008, the Franciscans objected to the disclosure of documents on the basis of the psychotherapist-patient privilege. The Individual Friars also objected that, as nonparties, they could not be bound by the settlement agreement; Paragraph 15 was not enforceable; and their confidential files were protected from disclosure by the psychotherapist-patient and the physician-patient privileges and their constitutional rights of privacy.
The Individual Friars argued the release of their personal psychiatric information to the Franciscans did not waive the privileges because disclosure was reasonably necessary to accomplish the purpose for which the psychotherapists had been consulted. They supported their privilege arguments with a copy of the April 1988 Operating Policies and Procedures in the St. Barbara Province for Friar Conduct. This document detailed the steps the Franciscans were to take when there were accusations of sexual abuse by friars.
On February 10, 2009, Judge Lichtman referred the Individual Friars' jurisdiction challenge to the coordinating trial judge, the Honorable Emilie Elias. On March 17, 2009, Judge Elias overruled the objections to the court's jurisdiction to decide whether to release the Individual Friars' files. Thereafter, proceedings were held before Judge Lichtman to resolve the objections to publication of the Individual Friars' confidential files.
On April 2, 2009, Judge Lichtman issued an order finding Paragraph 15 valid and enforceable, and the Individual Friars' rights had been preserved as they had been given notice and an opportunity to be heard. The court overruled the Franciscans' and the Individual Friars' objections based on the psychotherapist-patient privilege. The court was not persuaded that disclosure of the Individual Friars' psychological records to various Franciscan clergy was reasonably necessary to accomplish treatment and diagnosis of the alleged perpetrators. Further, the court held the Franciscans failed to submit evidence that they were "rendering psychotherapy to the alleged perpetrators *1232 or [were] being supervised by the treating psychotherapists. Instead, [the Franciscans] merely contend[] that `the evidence will show that there were two purposes for which alleged perpetrators were sent by the Franciscans for psychotherapy: 1) to obtain a diagnosis that would allow the Franciscans to make decisions concerning any continued ministry by the alleged perpetrator (including monitoring or other restrictions that may need to be imposed on the alleged perpetrator); and 2) to obtain treatment for the alleged perpetrator of any mental or emotional condition of the alleged perpetrator, including diagnostic information necessary to such treatment.'" (Fn. omitted.)
Moreover, the court found "the alleged perpetrators waived the privilege by attending the therapy treatments knowing that the information provided during the course of the therapy sessions would be shared with members of [the] Franciscan Friars. . . . The Operating Policies [and Procedures in the St. Barbara Province for Friar Conduct] . . . clearly indicated that information relating to the alleged perpetrators' treatment and diagnosis would be disclosed to other members of [the] Franciscan Friars." (Fn. omitted.) The court ordered the confidential files released and provided individual rulings on each document under seal, stating reasons for each document's release.

3. The appeals and the motion to be added as a party

On April 24, 2009, the Franciscans appealed from the April 2, 2009 order "and any preliminary orders relating thereto, including the Order . . . entered on June 18, 2007" as an appealable order after judgment. The Individual Friars filed a motion to set aside the April 2, 2009 order so they could be added as parties to the litigation for purposes of appeal, pursuant to Code of Civil Procedure section 663. Judge Elias denied the motion. Thereafter, the Individual Friars appealed from the order entered on April 2, 2009, and "any preliminary orders relating thereto, including the order . . . entered on June 18, 2007 . . . ." The Individual Friars filed an amended notice of appeal from the order denying their motion to be added as parties, as well as the orders from which they had previously appealed.

DISCUSSION
The Franciscans state the documents in issue here are a subset of those submitted to the trial court because the objections as to others have been withdrawn. They state the 154 pages that are the subject of this appeal consist almost entirely of psychological evaluations or progress reports prepared by psychotherapists who examined the Individual Friars. The documents have been lodged with this court under seal. At the heart of this appeal is whether the documents are protected by the constitutional right to privacy and the psychotherapist-patient privilege; the physician-patient privilege is not in dispute on appeal.

*1233 1. Issues raised solely by the Individual Friars

a. The Individual Friars have standing to appeal.

(1) Aggrieved parties may appeal from an adverse judgment. (Code Civ. Proc., § 902.) Additionally, "[n]onparties who are aggrieved by a judgment may appeal from it. `[A]ny entity that has an interest in the subject matter of a judgment and whose interest is adversely affected by the judgment is an aggrieved party and is entitled to be heard on appeal. However, the aggrieved party's interest must be immediate, pecuniary and substantial, and not merely a nominal or remote consequence of the judgment.' [Citations.]" (In re FairWageLaw (2009) 176 Cal.App.4th 279, 285 [97 Cal.Rptr.3d 652].) Those aggrieved "by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663[, even if the motion is unsuccessful]. [Citations.]" (County of Alameda v. Carleson (1971) 5 Cal.3d 730, 736-737 [97 Cal.Rptr. 385, 488 P.2d 953]; see Shaw v. Hughes Aircraft Co. (2000) 83 Cal.App.4th 1336, 1342 [100 Cal.Rptr.2d 446].) "Additionally, a nonparty may appeal if a judgment or order has a res judicata effect on the nonparty. [Citation.]" (People v. Hernandez (2009) 172 Cal.App.4th 715, 720 [91 Cal.Rptr.3d 604].)
Although the Individual Friars were not parties to the underlying lawsuits, Paragraph 15 specifically provided that all alleged perpetrators, including the Individual Friars, had the right to submit objections before a hearing officer decided whether their confidential records could be disclosed. Here, the disclosure orders will affect the personal and pecuniary interests of the Individual Friars, and they will be bound by the effects of res judicata. Thus, the Individual Friars are aggrieved persons with the right to appeal the disclosure orders.

b. The Individual Friars timely appealed from the April 2, 2009 order.

(2) Plaintiffs contend the Individual Friars did not timely challenge the June 18, 2007 order because it was an appealable order when entered. "Code of Civil Procedure section 904.1 is `[t]he principal statute [that] defines the scope of appellate jurisdiction in the Court of Appeal . . . .' [Citation.] Generally speaking, only final judgments are appealable under the statute. [Citation.]" (Mercury Interactive Corp. v. Klein (2007) 158 Cal.App.4th 60, 75 [70 Cal.Rptr.3d 88].) "In keeping with this rule, section 904.1 generally authorizes appeals from superior court judgments, except those which are interlocutory. ([Code Civ. Proc.,] § 904.1, subd. (a)(1).) Further, when an appeal is taken pursuant to section 904.1, the reviewing court may review *1234 `any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party.' ([Code Civ. Proc.,] § 906.)" (Doran v. Magan (1999) 76 Cal.App.4th 1287, 1293 [91 Cal.Rptr.2d 60].)
"It is the substance and effect of the adjudication, and not the form, which determine if the order is interlocutory and nonappealable, or final and appealable. [Citation.] If no issues in the action remain for further consideration, the decree is final and appealable. But if further judicial action is required for a final determination of the rights of the parties, the decree is interlocutory. [Citation.] The decree will not be appealable `unless it comes within the statutory classes of appealable interlocutory judgments.' [Citations.]" (Doran v. Magan, supra, 76 Cal.App.4th at p. 1293.)
The June 18, 2007 order was only the first step in proceedings to decide if the Individual Friars' confidential records were to be disclosed. The court neither ordered release of the documents nor ruled they were privileged from disclosure. Rather, the court took the first step in the resolution of the issue in finding the Individual Friars' privacy interests did not preclude disclosure. Unlike those situations in which a court's order was a final resolution of a disclosure dispute, here, after the June 18, 2007 order was issued, additional proceedings were required before any documents could be published. (Compare with Mercury Interactive Corp. v. Klein, supra, 158 Cal.App.4th at pp. 76-77 [order directing unsealing of document appealable]; In re Marriage of Lechowick (1998) 65 Cal.App.4th 1406, 1410-1411 [77 Cal.Rptr.2d 395] [order denying journalist's application to unseal documents appealable]; In re Marriage of Burkle (2006) 135 Cal.App.4th 1045, 1051, fn. 6 [37 Cal.Rptr.3d 805] [order denying sealing of pleadings in divorce proceeding was final order on collateral matter].)

c. The trial court did not abuse its discretion in balancing the competing interests and concluding the Individual Friars' privacy interests did not preclude disclosure of the documents.

(3) "[T]he right of privacy protects the individual's reasonable expectation of privacy against a serious invasion. [Citation.]" (Pioneer Electronics (USA), Inc. v. Superior Court (2007) 40 Cal.4th 360, 370 [53 Cal.Rptr.3d 513, 150 P.3d 198] (Pioneer Electronics).) However, "[p]rivacy concerns are not absolute; they must be balanced against other important interests. [Citations.] `[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution] . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy.' [Citation.]" (Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 37 [26 Cal.Rptr.2d 834, 865 P.2d 633] (Hill).)
*1235 Plaintiffs concede the Individual Friars have a privacy interest in their confidential files and the psychiatric reports contained therein. Plaintiffs also concede releasing these documents will be a serious invasion of those interests. Thus, this appeal turns on whether the trial court correctly found countervailing interests warrant the disclosure of these documents.
(4) "Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities. Their relative importance is determined by their proximity to the central functions of a particular public or private enterprise. Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." (Hill, supra, 7 Cal.4th at p. 38.) "[I]n applying the Hill balancing test, trial courts necessarily have broad discretion to weigh and balance the competing interests." (Pioneer Electronics, supra, 40 Cal.4th at p. 371.)
(5) Here, the compelling social interests in disclosure of information relating to sexual predators of children outweigh the Individual Friars' privacy interests. "`The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years.'" (Enrique M. v. Angelina V. (2009) 174 Cal.App.4th 1148, 1154 [94 Cal.Rptr.3d 883], quoting Palmore v. Sidoti (1984) 466 U.S. 429, 433 [80 L.Ed.2d 421, 104 S.Ct. 1879].) Demonstrating this important public interest, numerous statutes have been enacted to protect children from sexual predators. (E.g., Welf. & Inst. Code, § 300 et seq.; id., § 300.2 [dependency laws to protect children from abuse]; Pen. Code, § 647.6 [criminal penalty for child sexual molestation]; Pen. Code, § 290 et seq. [Sex Offender Registration Act].) When California enacted its own "Megan's Law" for the collection and disclosure of information about registered sex offenders, the Legislature "found that the public had a `compelling and necessary . . . interest' in obtaining information about released sex offenders so they can `adequately protect themselves and their children from these persons.' (Stats. 1996, ch. 908, § 1(b).)" (Fredenburg v. City of Fremont (2004) 119 Cal.App.4th 408, 412-413 [14 Cal.Rptr.3d 437].)
Here, the record revealed that friars in Santa Barbara had sexually abused 54 victims since 1958. Plaintiffs identified 41 child-abusing clergy who were transferred to, or allowed to live in, Santa Barbara at various times since 1960. Of those, 24 were Franciscans, including nine of the perpetrators subject to the settlement. The trial court found that all Individual Friars had either admitted to sexual molestation of a minor or conceded such conduct, or *1236 records indicated they had a propensity to commit sexual acts. Friar Van Handel had been criminally convicted and ordered to register as a sex offender.
Surely, all members of the Santa Barbara Franciscan province, as well as members of the Catholic Church throughout California, have a compelling interest in knowing what treatment the Individual Friars received, if any, for their predatory proclivities, and whether it was adequate to protect young parishioners whom they may have encountered in their ministries. Plaintiffs, former members of the Santa Barbara Franciscan province who have suffered the lifelong effects of childhood abuse, have the same interests as other members of the province and society in having the documents of their abusers released. Indeed, all citizens have a compelling interest in knowing if a prominent and powerful institution has cloaked in secrecy decades of sexual abuse revealed in the psychiatric records of counselors who continued to have intimate contact with vulnerable children while receiving treatment for their tendencies toward child molestation.

d. The court had jurisdiction pursuant to Code of Civil Procedure section 664.6 to decide the disclosure of the psychiatric reports.

(6) Code of Civil Procedure section 664.6 (Section 664.6) is designed to enable the court to enforce settlements. It permits "`a court, via a summary proceeding, to finally dispose of an action when the existence of the agreement or the terms of the settlement are subject to reasonable dispute, something not permissible before the statute's enactment.'" (Wackeen v. Malis (2002) 97 Cal.App.4th 429, 432, fn. 1, 439 [118 Cal.Rptr.2d 502].) The section was amended in 1993 to expressly permit courts to retain jurisdiction after dismissal to enforce the terms of the settlement, if requested to do so. (Stats. 1993, ch. 768, § 1, p. 4260; Wackeen v. Malis, supra, at pp. 432, fn. 1, 433.)
"`[A] judge hearing a section 664.6 motion may receive evidence, determine disputed facts, and enter the terms of a settlement agreement as a judgment [citations], [but] nothing in section 664.6 authorizes a judge to create the material terms of a settlement, as opposed to deciding what terms the parties themselves have previously agreed upon.' [Citation.]" (Hernandez v. Board of Education (2004) 126 Cal.App.4th 1161, 1176 [25 Cal.Rptr.3d 1].) The term "`parties to pending litigation'" means the litigants themselves. (Kirby v. Southern Cal. Edison Co. (2000) 78 Cal.App.4th 840, 844 [93 Cal.Rptr.2d 223]; Elnekave v. Via Dolce Homeowners Assn. (2006) 142 Cal.App.4th 1193, 1198 [48 Cal.Rptr.3d 663].) It "means the specific person or entity by or against whom an action was brought. [Citation.]" (Elnekave, at p. 1198.)
*1237 "In a statutory settlement proceeding, we review the trial court's determination of factual matters for substantial evidence. To the extent we engage in the proper interpretation of section 664.6, however, we exercise our independent review. [Citation.]" (Elnekave v. Via Dolce Homeowners Assn., supra, 142 Cal.App.4th at p. 1198.) Thus, "the determination of whether the statutory requirements were met is a question of law which we review independently . . . ." (Conservatorship of McElroy (2002) 104 Cal.App.4th 536, 544 [128 Cal.Rptr.2d 485].)
Here, the settlement agreement specifically authorized the court to retain jurisdiction to decide the disclosure of documents pursuant to the procedures detailed in Paragraph 15. The Franciscans had produced many confidential records of the Individual Friars in discovery and were in possession of more such records not produced but listed on privilege logs. Plaintiffs were entitled to bargain for unrestricted disclosure of these records, and the Franciscans were entitled to agree to a procedure by which the court retained jurisdiction to decide whether the documents could be disclosed over the objections of any friar.
The Individual Friars argue the trial court did not have jurisdiction to address the dissemination of their confidential records because they were not parties to the lawsuits nor parties to the settlement agreement. However, it is immaterial that the Individual Friars were not parties to the litigation; what is material is that the court and the parties possessed documents produced by the Franciscans in discovery or listed on privilege logs, and the parties had every right to agree upon the means to determine if those documents were to be made public.
Even though the Individual Friars were not parties to the lawsuits or the settlement agreement, the agreement preserved their rights to assert any lawful objection to the publication of their confidential files. The settlement agreement and the procedures established by Judge Lichtman provided the Individual Friars with notice and an opportunity for their privacy interests to be heard. The court protected the Individual Friars' rights by balancing their interests against the need for disclosure.
(7) Courts routinely decide the rights of third parties when information relating to them is directly relevant to issues in litigation and there is a compelling need for disclosure essential to the resolution of the case. (E.g., Code Civ. Proc., § 1985.3, subd. (e) [consumer records subpoena]; id., § 1985.6 [employment records]; id., § 2016.010 et seq. [Civil Discovery Act]; Alch v. Superior Court (2008) 165 Cal.App.4th 1412 [82 Cal.Rptr.3d 470] [personal information about third persons subpoenaed, documents released over privacy right objections].) The process by which the court enforced the *1238 settlement agreement was fair, and the court properly exercised its jurisdiction pursuant to Section 664.6 to decide whether documents in the possession of the Franciscans could be publicly disclosed.

e. The trial court reasonably adopted procedures from the Civil Discovery Act to enforce the provisions of Paragraph 15 of the settlement agreement.

The Individual Friars raise a number of unpersuasive arguments premised upon the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.). They argue the Civil Discovery Act could not be used in the Section 664.6 proceedings. However, they cite no authority stating that parties to a settlement agreement cannot provide procedures to enforce their agreement modeled on the Civil Discovery Act. (Compare with San Diego Unified Port Dist. v. Douglas E. Barnhart, Inc. (2002) 95 Cal.App.4th 1400, 1405 [116 Cal.Rptr.2d 65] [courts have no inherent power to create new or modified methods of discovery]; Pillsbury, Madison & Sutro v. Schectman (1997) 55 Cal.App.4th 1279, 1288 [64 Cal.Rptr.2d 698] [parties to an action cannot operate outside the parameters of the Civil Discovery Act to obtain discovery].)
The court had jurisdiction under Section 664.6 to decide what documents could be published and the concomitant power to decide what procedures to use to ensure fair process in the decisionmaking. The court did not have to consider the Civil Discovery Act in enforcing the settlement agreement and could have devised its own procedures, but it was free to adapt discovery act procedures that are familiar and routinely applied by lawyers and courts. This case is not analogous to Department of Fair Employment & Housing v. Superior Court (1990) 225 Cal.App.3d 728 [275 Cal.Rptr. 156], in which discovery could not be taken after summary judgment had finally disposed of the action. The court here had jurisdiction to order the unprotected disclosure of documents and prudently adopted the procedures of the Civil Discovery Act in exercising its discretion to do so.

2. The psychotherapist-patient privilege does not preclude disclosure of the psychiatric reports.

The April 1988 Operating Policies and Procedures in the St. Barbara Province for Friar Conduct were discussed at length in the trial court and on appeal. The document acknowledged that "[i]n recent times there have arisen not infrequently accusations against members of religious communities . . . regarding misconduct in their ministry . . . ." It then set forth procedures to be implemented to deal with such accusations, including psychological counseling and treatment.
*1239 A team consisting of "the provincial minister and two friars knowledgeable about the province, its policies, its insurance, finances, and other resources" would be formed to consider the following, among other considerations, in addressing particular accusations of misconduct: "(5) If there seems to be a basis for the accusations, the team will arrange for appropriate psychological evaluation. Normally the recommendations of the evaluation will be followed regarding treatment, limitations on ministry, and other considerations of the friar, [¶] (6) Following the treatment program or other appropriate measures to address the behavior, the team will recommend to the provincial council whether reassignment is appropriate, and if so what kind of assignment should be made, any possible restrictions that might apply, and any followup program that is prescribed. Normally this will be on the recommendation of those responsible for the treatment program. Spiritual direction will be part of this program. [¶] . . . [¶] (10) The provincial minister and the team he appoints shall supervise long term care and follow up programs resulting from evaluations and treatment. They shall see to it that appropriate superiors and supervisors are informed on the basis of `need to know'. They will also do all they can to support the friar in the period of recovery. . . ."
The Individual Friars offered to prove that given their vows of poverty and obedience, "the treatment would not have been possible without the Franciscans paying for the treatment and that treaters requested the Franciscans' input and oversight regarding the Friars' backgrounds, and ongoing consultation regarding the progress of the Friars." Counsel for the Franciscans explained that when they received a report of abuse, the Franciscans sent the alleged perpetrator for a psychological evaluation. The Franciscans received a report from the psychotherapist which they used to decide what restrictions to put on the friar's ministry and what treatment he needed.
(8) Evidence Code section 1014 sets forth the psychotherapist-patient privilege. A patient, whether or not a party to litigation, has a privilege to refuse to disclose, and to prevent another from disclosing, confidential communications with a psychotherapist. "Confidential communication between patient and psychotherapist" is defined as "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted, and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship." (Evid. Code, § 1012, italics added.)
*1240 (9) Evidence Code section 912, subdivision (a) specifies that a privilege, including the psychotherapist-patient privilege, is waived "if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. . . ." Subdivision (d) of Evidence Code section 912 provides the psychotherapist-patient privilege is not waived when a confidential disclosure is reasonably necessary for the accomplishment of the purpose for which the psychotherapist was consulted.
A number of cases illustrate when communications to third persons preserve the psychotherapist-patient privilege because the communications were "reasonably necessary" to accomplish the purpose for which the psychotherapist was consulted. (E.g., Grosslight v. Superior Court (1977) 72 Cal.App.3d 502, 506 [140 Cal.Rptr. 278] [communications between parent and hospital were made to assist in the diagnosis and treatment of the minor]; People v. Gomez (1982) 134 Cal.App.3d 874, 881 [185 Cal.Rptr. 155] [statements made to student interns with the family court services office not privileged because interns not included in Evid. Code, former § 1010's definition of a psychotherapist]; Luhdorff v. Superior Court (1985) 166 Cal.App.3d 485, 490 [212 Cal.Rptr. 516] [conversations between criminal defendant and clinical social worker who worked under a therapist were privileged]; Farrell L. v. Superior Court (1988) 203 Cal.App.3d 521 [250 Cal.Rptr. 25] [communications among patients in group therapy session privileged because made in confidence to facilitate patient's treatment].)
In Roman Catholic Archbishop of Los Angeles v. Superior Court (2005) 131 Cal.App.4th 417 [32 Cal.Rptr.3d 209] (Roman Catholic Archbishop), Division Three of this district held that almost all documents in another clergy-abuse case were not shielded by the psychotherapist-patient privilege. As an example, the court found a copy of a psychotherapeutic evaluation sent by a priest's therapists to a member of the Vicar for Clergy's staff was not privileged because the Vicar for Clergy's staff was not involved in rendering psychotherapy to the priest, not was staff being supervised by a treating psychotherapist. (Id. at p. 455.)
(10) Likewise, in this case, substantial evidence supports the trial court findings that the Individual Friars voluntarily permitted the therapists to disclose to the Franciscans the psychiatric reports in dispute for purposes unrelated to the friars' diagnoses and treatment. "We review the trial court's privilege determination under the substantial evidence standard." (Roman Catholic Archbishop, supra, 131 Cal.App.4th at p. 442.) The opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential. (Evid. Code, § 917, subd. (a).) The Individual Friars and the Franciscans argue the April 1988 Operating Policies and *1241 Procedures in the St. Barbara Province for Friar Conduct demonstrate disclosure to the Franciscans was part and parcel of the treatment process, and thus, was "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted.. . ." (Evid. Code, § 1012.) However, the Franciscans were not involved in rendering psychotherapy treatment to the Individual Friars, nor were they involved in the diagnostic process or in facilitating the therapist in diagnosing or treating the Individual Friars.
(11) Rather, the Franciscans obtained the records to make personnel decisions and to arrange for treatment so the Individual Friars could continue their ministry on behalf of the Franciscans. The Franciscans paid for the therapy to make sure the Individual Friars received treatment, but the psychological records were not disclosed to the Franciscans for diagnostic and treatment purposes. It also makes no difference that the Individual Friars were told and believed their psychological records would be kept confidential. Their voluntary disclosure of these records to the Franciscans for purposes that were not reasonably necessary for diagnosis and treatment operated as a waiver of the privilege irrespective of what the Franciscans may have told the friars. (Evid. Code, §§ 1011, 1012.)
The Franciscans analogize their role to that of a physician reporting adverse drug reactions to a drug manufacturer (Rudnick v. Superior Court (1974) 11 Cal.3d 924 [114 Cal.Rptr. 603, 523 P.2d 643]) and the disclosure of information to an insurance company so physicians will get paid (Blue Cross v. Superior Court (1976) 61 Cal.App.3d 798 [132 Cal.Rptr. 635].). The Rudnick court found there was no waiver of the privilege if the doctor revealed confidential patient information about adverse drug reactions to the drug manufacturer to obtain assistance in using the drug to treat the patient. In Blue Cross, there was no waiver of the privilege when the doctor sent confidential patient information to the insurer because "disclosure to accomplish payment is reasonably necessary to achieve the consultation's diagnostic and treatment purposes." (61 Cal.App.3d at p. 801.) Thus, in both Rudnick and Blue Cross, the patient's treatment was or may have benefited by the disclosure. Here, in contrast, substantial evidence supports the trial court's finding that the disclosure of the Individual Friars' psychological records to the Franciscans did not achieve the purpose of diagnosis or treatment.[2]
*1242 The Franciscans are correct that the motivation to seek treatment is immaterial to the privilege (Story v. Superior Court (2003) 109 Cal.App.4th 1007, 1016-1017 [135 Cal.Rptr.2d 532]), and it makes no difference that they sought treatment because they were ordered to do so. That does not change our finding there was substantial evidence that the release of information to the Franciscans was not "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted . . . ." (Evid. Code, § 1012.)
(12) The Franciscans argue the opinion in Roman Catholic Archbishop, supra, 131 Cal.App.4th 417, and the trial court's ruling in this case both improperly analyzed the privilege by finding the documents were not disclosed to those who were rendering therapy or being supervised by the treating psychotherapists. The definition of a "psychotherapist" includes those who work under the supervision of other licensed professionals. (Evid. Code, § 1010, subds. (f)-(j).)[3] The references by Roman Catholic Archbishop and the trial court to those who were supervised by licensed professionals did not misdirect the analysis, as both focused on whether or not the communication was "reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted.. . ." (Evid. Code, § 1012.)
The Franciscans also argue the trial court's analysis was faulty as it conflated the definition of the purpose for which a patient consults a therapist by stating it in the conjunctive, i.e., for "diagnosis and treatment," rather than in the disjunctive, i.e., "diagnosis or treatment." However, the trial court plainly analyzed the facts in the disjunctive, finding the communications to the Franciscans were not for diagnosis or treatment.

*1243 DISPOSITION
We affirm all the orders of the trial court challenged in this appeal and consequently hold that the documents in the possession of the Franciscans concerning the Individual Friars may be publicly released. Plaintiffs are awarded costs on appeal.
Rubin, Acting P. J., and Flier, J., concurred.
NOTES
[1] Twenty-three plaintiffs filed actions in The Clergy Cases I, Judicial Council Coordination Proceeding No. 4286. One plaintiff filed an action in The Clergy Cases III, Judicial Council Coordination Proceeding No. 4359. One plaintiff claimed abuse, but had not yet filed an action. The lawsuits and accusations also involved other defendants who are not parties to this appeal and thus have been discussed only when necessary. These 25 lawsuits are among many other such actions throughout the state against various entities and individuals affiliated with the Catholic Church for childhood sexual abuse. The cases have been coordinated in the Los Angeles County Superior Court and the Alameda County Superior Court. The Second District Court of Appeal has been designated as the intermediate appellate court for the coordinated cases.
[2] We find particularly inapt the Franciscans' citation of cases as analogous authority involving preservation of the psychotherapist-patient privilege where children's records were disclosed to the juvenile court or probation officer. (See, e.g., In re Christopher M. (2005) 127 Cal.App.4th 684 [26 Cal.Rptr.3d 61] [delinquency]; In re Mark L. (2001) 94 Cal.App.4th 573, 580-584 [114 Cal.Rptr.2d 499] [dependency].) The Individual Friars' vows of poverty and obedience do not render them childlike in the eyes of the law. We recognize the friars were impoverished and bound to cooperate with their church. But preservation of the privilege depends on whether the Individual Friars' psychological records were disclosed to the Franciscans to achieve diagnostic and treatment purposes rather than to help the Franciscans decide where to assign each friar and under what restrictions. There is no valid comparison of children under the supervision of the dependency or delinquency court to grown men who are sufficiently sophisticated to escape public awareness of their alleged child molestation for decades.
[3] "Psychotherapist" is defined to include specific licensed or credentialed individuals, including psychiatrists, psychologists, clinical social workers, school psychologists, marriage and family therapists, certain registered nurses and persons rendering mental health treatment or counseling services as authorized pursuant to section 6924 of the Family Code. The definition also includes those who work under, and are supervised by, the licensed or credentialed individuals. These include psychological assistants, associate clinical social workers, psychological interns, and trainees. (Evid. Code, § 1010.)